Turn next to our next case, William Kivett v. Flagstar Bank, case number 21-15667. Yes, good morning, your honors, and may it please the court, Brian Schmalzbeck for Flagstar Bank. I'd like to reserve three minutes for rebuttal. This case is about the scope of Luznak, where one bank sought to preempt all state interest on escrow laws without any evidence that California's law significantly interfered with that bank's powers in particular. Counsel, of course you recognize that you face an uphill battle here because of Luznak in this court. Help me understand why this outcome should be different given Luznak. Certainly, I think there's two reasons. One, the procedural posture of Luznak was different. Luznak, of course, was at the motion-to-dismiss stage. Well, but that actually seems to go against you because the motion-to-dismiss stage, that suggests that evidence wasn't particularly relevant and that it was a per se rule. So how does that help you? And the second reason explains why, your is that Bank of America made a litigation decision in that case to swing for the fences. They wanted to knock out 2954.8 without regard to evidence as to them or anybody else. And so you see in footnote six, I'm sorry, footnote seven, where the court recognizes that Bank of America has disclaimed any reliance on that evidence. And in fact, Judge- Well, but I read footnote seven a little differently. I mean, not just that Bank of America disclaimed it. You're right that they left the possibility open, but I don't think it's a fair reading of Luznak to suggest they left the possibility open as to the California statute at issue. Meaning perhaps if you were in a different state that applied a higher interest rate payable, then maybe you'd have this argument. But given Luznak, the court seemed to say 2%, which is the exact same statute we're dealing with here, that that was not a significant, what is it, significant impairment of- A significant interference. Your Honor, I think there's two points in response to that. The first is that Luznak is applying Dodd-Frank. And so we need to look at Dodd-Frank to determine what Luznak really did do. And Dodd-Frank gives us some unusually specific directions on how to make this preemption determination under the National Bank Act that are really important here. And they explain why Luznak doesn't control this case. And what Dodd-Frank says is it provides for a case-by-case preemption inquiry by bank regulators based on, quote, substantial evidence made on the record. That's the key in section 25B, subsection B. And although that substantial evidence standard applies specifically to the OCC, substantial evidence being an agency fact-finding standard, Dodd-Frank makes clear by using that language that preemption under the National Bank Act is sensitive to evidence. It's not a pure question of law. If it were a pure question of law, that language in Dodd-Frank wouldn't make any sense. So counsel, explain to me, assume that we're really not going to overrule Luznak. How could we craft a decision that could distinguish the evidence, the facts that were presented to the district judge on summary judgment here, and not overrule Luznak? Certainly, Your Honor. And the premise of your question is correct, that we are not asking this panel to overrule Luznak. But the way I would craft that decision is by looking to the, I'll make my Latin teacher proud, by looking to the ratio dissidenti of Luznak, which depends on- Okay, my Latin is kind of rusty, so maybe you could translate. It's the rationale for the decision, the basis of decision. It looks first to the OCC and says, we recognize that the OCC has made this preemption call based largely on pre-Dodd-Frank determinations, and we find that insufficient. So we're not going to rely on the OCC. Second, it says, we're going to look to a different part of Dodd-Frank that addresses an amendment to the Truth in Lending Act, section 1639 DG 3. And what Luznak says about that is it says, that shows that Congress thought that state escrow interest laws, quote, do not necessarily trigger this preemption. It doesn't hold that Tyler makes all this preemption inquiry irrelevant. It just says that they're not well, when are they preempted? And Luznak did not answer that question, because it didn't have to, because all that Bank of America asked was for this, this home run swing. We want it all gone in one fell swoop. So we're not going to rely on evidence. And of course, that the motion- Well, the problem is they, the problem is they hit the home run. And so it's kind of hard to claw it back. I mean, you know, you say Bank of America, their strategy seemed to work. They said we want it out. And our court gave them what they wanted with the carve out of footnote seven. And that's the question that I just don't see how you fit within footnote seven. I'm not sure how anybody into the California law could fit within footnote seven. Your Honor, Luznak rejected what Bank of America asked. They said, we're not going to hold that it's preempted as a whole. And that- It was an all or nothing proposition. And Bank of America did get what it wanted there. It got a decision that was based on an all or nothing. And in Bank of America's case, it was nothing. But you're stuck with that. And you're halfway through your time. And I haven't heard any explanation as to why Luznak does not apply to your client. Your Honor, I think if you don't recognize that footnote seven in Luznak is really putting weight on what Bank of America chose to do in that case- Counsel, tell me why your client, I'll just keep repeating the question, but I'm not getting an answer. Why isn't your client bound by Luznak? What is it that your clients, that California's law is preempted with respect to your client, but California's law is not preempted with respect to Bank of America? Thank you for the clarification, Your Honor. 2954.8 is preempted as to Flagstar because in this record, there is evidence of significant interference as to Flagstar. It was not preempted as to Bank of America because in the Luznak record, there was no evidence of significant interference. And there was- Can you point me to any, of course, there wasn't evidence of significant, it was motion dismiss. So, I mean, that's the problem. So footnote seven, let's just drill down on footnote seven. Because footnote seven, the second sentence says, let's just read it. In so constrained the term applicable, we do not suggest that a state escrow interest law can never be preempted by the NBA. Okay, so you're right. There is this exception. What is the exception? For example, a state setting punitively high rates banks must pay may prevent or significantly interfere with the bank's ability. That suggests that it's the punitively high rates. And I mean, if you, you know, let's go back to your little Latin phrase. That means that this was not punitively high, what was said in Luznak, and you're dealing with the same rate. So that's the problem I keep coming back to, is you keep focusing on, well, the facts are disproportionate because we're a smaller bank. That may be. I have no question that if, you know, this was impede, if we were dealing with the same issue we dealt with in McShannock, you might have a case. But that's not what we're dealing with. We're dealing with, you know, significantly interfere. And they seem to set a law that basically anything at this rate or under just doesn't significantly interfere. It didn't make a distinction between the bank's bottom line. I mean, to the contrary, the court recognized banks were going to lose out and have to pay interest on notes that they did not anticipate at the time of entering into the contract paying interest on. I have no doubt that that occurred to your client. But that seems to be the harm, is that your client says, hey, we entered into this note. We were not expecting in 2015 to have this note and other notes, you know, that cost us $9 million. There's no question that that's probably true. But how is that a significant interference with the lending opportunities given that footnote seven seems to be limited to just the bank rate? Can you point me to language in footnote seven that gets you to your factual inquiry that you want to make? Yes, Your Honor. It's and it requires an inference from this language. But when it says, for example, we know that a punitively high rate is one example of something that would cause significant interference under Luzna. But the question that I suggest that the court would have to answer in a future case is, well, let's let's suppose let's take it out of California just for the moment. How do we determine whether a law imposes a punitively high rate, which we know from footnote seven is going to cause significant interference? What is that inquiry look like? And what I suggest is that under Dodd-Frank, what that inquiry looks like is a factual inquiry that depends on evidence of significant interference. And yes, this this footnote seven isn't addressing that other state case. But let's go back and maybe this is what Judge Bybee was asking earlier. Let's assume that we can get past footnote seven. Let's assume we can get into a factual inquiry. How is in your case, you know, my recollection of the facts is only 20 percent of your loans are subject to this IOE because the rest are managed or are serviced by other lenders. Is that is that correct? The yes, your honor, the 20 percent are loans where Flagstar is the ultimate economic interest holder there. They're on the hook. So how is that? I mean, are they impeded from issuing new loans? Are they about ready to go bankrupt? I mean, what what is it that you would say this shows significant impact? So, your honor, first, I would say, first of all, that the there's no requirement under Barnett Bank that you'd be approaching bankruptcy or anything like that. I understand. I'm just asking, what is it? Right. It's important because it sets the threshold for what we would have to show. And what we would have to show here is that state law is forcing us to to set the interest rate of the bank account. I think we all agree that state law couldn't go in and say all of Flagstar's passbook savings account should now be set at 2 percent interest. But that's exactly what they've done here as to interest on escrow. And what's what's important about that is that during this class period, that is nearly orders of magnitude larger than Lesnick said. Two percent was fine. Les. Your honor, what our position is that Lesnick did not have any evidence to decide whether 2 percent was fine or not. And Bank of America rejected the need to present any evidence. So you think you could say on summary judgment for Flagstar, two percent's not fine and not overrule Lesnick? Yes, your honor. What what has to be done on summary judgment is determine whether Flagstar, unlike Bank of America, has presented evidence of significant interference. And so we we have that evidence in this record that Bank of America not only lacked, but said they didn't want to provide said it's categorically irrelevant. So are you referring to the Mansell and Chang declarations? That's correct. I have to say they were not very impressive. They were very, very speculative. They were they were they were gee, this this could cause this could cause some discomfort for us. And I can't say there was very there. I understand, your honor. I think two points. One is that if if we need to consider those, the district court at a minimum needs to consider those in the first instance, because the district court, you know, in that five line order obviously did not consider those declarations. But I think more to your exact point is that there there is an element of trying to predict the future in those declarations because of the nature of the interference that hadn't come to pass yet as as we've explained in the briefs in the past, Flagstar did not did not pay two percent interest on escrow loans. So we do have to try to make a prediction about what the effect of that change policy is going to be in the future. It doesn't seem to be too hard to figure out. It's in fact, you guys figured it out pretty well here. It's nine million dollars. That's the effect. And I understand that that wasn't built into the bottom line. But this isn't rocket science. I mean, you have to pay two percent. You weren't paying two percent. I mean. Your Honor, I think we can look to McShannock and see that it's not just the nine million dollars. It's the downstream effects of the need to pay that nine million dollars, which is going to have all kinds of trickle down effect. I know I fully understand. I mean, I'm very familiar with McShannock, as you're probably aware. And and but again, we were dealing with a lower it was a lower standard in that case. So we've we've taken you. We'll give you time for rebuttal if if you mean it. We've taken you past your time. And let's thank you. Unless there's more questions at this point. OK, we'll hear from Appley. Yeah. Yeah. Please take off your mask. Thank you. Good. Good morning, Your Honors. May it please the court. I'm Peter Fredman for plaintiffs, appellees, William Kivitt, et al., including the certified class. Listening to the argument, I'm going to skip. I'm going to go a little out of order to be try and be more responsive. All this is in the record. So Flagstar originates loans. It acquires all new loans, either through originations or buying them through correspondent lenders. It sells most of the rights in those loans, the income streams that those loans generate. It sells most of them. It sells the sort of loan asset. Almost 100 percent of the loan assets are sold downstream. Eighty percent of the servicing rights are sold downstream, but it retains the subservicing rights. And of course, each of these is a stream of income. So of the 100 percent of IOE, interest on escrow, IOE on 80 percent of these loans. And it's been doing that since it's starting in 2017. It started. And it didn't have an expectation. Just so I'm clear, when it entered into those loans, it did not have an expectation of having to pay that interest. But it is. It is paying. I don't know what it's exactly. It's clearly still has an expectation of not wanting to pay the interest. I understand. I guess what I'm trying to ferret out is how much of this was before. I don't know that it matters, but how much of this is before 2018 or 19 when Loessnack came out? Well, it started paying IOE on the loans. It was subservicing. It was doing all the consumer-facing business, but it had sold the master servicing rights, that stream of income, as it sold it to someone else. So it started paying IOE on those loans before Loessnack came out in 2017. And it was a process, investor by investor. By now, it pays IOE on all those loans. Loessnack came out in 2018. We don't know exactly what stimulated this change of policy. So why are they balking? I shouldn't be asking you, but why is the dispute now about these 20 percent? What makes them different? The difference is that they own the master servicing rights. So as I understand it, it costs them money. So when they sold the servicing rights downstream- They were able to build it in. They were able to, whoa. Well, maybe or maybe not, depending on when the loan originated. But we don't have visibility into their individual contracts with their investors. But from their point of view now, as I understand it, it doesn't cost them anything because they're passing that cost, or lack of profitability, however you see it, through to the master servicing holder, MSR holder. Whereas this 20 percent where they still don't want to pay is because they own the master, they retain the master servicing rights, unlike the 80 percent, and that will cost them money. So that's what we're talking about here. It's purely a loss of anticipated profitability. It's profitable to hold money. If you're a financial institution, it's profitable to hold money without paying interest on it. You can lend it out. And it's less profitable to have to pay interest on that money. And- So let me ask you about footnote seven in LUSNAC. You agree that there is some door open where we could find that this is a punitively high rate, but not in this case. Yeah, not in this case. I don't agree with that in this case, of course. But also, LUSNAC is a two-year-old case. It's just- But you could- Yes, going forward, you could imagine massive changes in either the interest rate- In your interpretation of LUSNAC, the only way would be if it was an interest rate higher than two percent? Or do you think that it can depend on- I mean, because you could foresee a bank that may perhaps built in a much higher expectation. What if it was 100 percent of their loans, and this was a much bigger impact on bottom line, and they really were going to have to make some substantial changes? They were going to have to restrict the number of loans that they could issue because they didn't have as much liquidity or something like that. At some point, could you have the same interest rate that would have a larger impact on a bank, and therefore might still fit within footnote seven of LUSNAC? My answer to that is no. The preemption is a question of congressional intent. And so the 12 U.S.C. 25B, which I call an anti-preemption statute, I know that's being a little exaggerated, but clearly intended to rein in preemption. And there's nothing to indicate there that the Congress intended to have variations in what was preempted based on who was asking for the preemption. There is no evidence of that sort of congressional intent. Well, but to be fair, the evidence is what significantly impedes. And I mean, it's also not clear that they, I mean, they didn't set an interest rate that said this is prohibitively high where it impedes. So one way or another, you're asking the court to get involved in at what point is the law preempted. And the question is, does LUSNAC say rate is all we can look at? Or does it say, no, you can actually look at the impact to the specific bank? LUSNAC is following 12 U.S.C. 25B, and that's the congressional intent. And it's pretty clear that the congressional intent with regard to this aspect of preemption, the 12 U.S.C. 25B, is not to make distinctions between small, medium, and large banks or those type of factors. If Congress wanted to, in the escrow statute, 14 15 U.S.C. 1639d, Congress did make some exceptions to the requirement to pay escrow, and thus to pay interest on escrow. And it did that. It did differentiate between sizes of banks, sizes of loans. It's a complex formula. But Congress knew if it wanted to say significantly interferes with the law. You seem to be reading footnote 7 out of it. Clearly, there's some interest rate, say this was a 10% interest rate or a 20% interest rate, that could prevent or significantly interfere. I agree with that, absolutely. But I was responding to the idea of big bank versus little bank. So if you're saying, is there an interest rate that could be punitively high? Of course there is. But the reason that the interest rate could be punitively high is because the impact that it has on the bank. But it would have to be across the board. The congressional intent here is not to set a series of different preemption standards based on categories of sizes of banks. I'm not, I mean, I understand your argument, and that seems intuitive, but that doesn't, the language prevents or significantly interferes with the exercise of national banking powers, I think could be different based on each bank. Well, we would have to, that's a... I understand that question. We're having a hypothetical discussion. Yeah, I mean, they... Part of it, the reason I'm asking this is because I guess I'm starting to, I mean, did Lesnick get it right or did we close the door to... No, so the standard is prevents or significantly interferes. And Lesnick got it right. The interest on escrow... Even if they got it right in that case, did we state the rule too broadly and have unintended consequences in subsequent cases? No, what that footnote seven means is that there could be new interest on escrow laws in other states that have not been considered yet, that were not around at the time of Dodd-Frank. There could be very different interest rate environments that arise on some future date. Things can change. And somebody seeking preemption could come in and say, this is punitively high for this reason. I don't think that the congressional intent behind 12 U.S.C. 25B contemplates saying the environment has changed. The environment didn't change, but we, in particular, are entitled to a special preemption because of our size, shape, color, whatever. I don't think that's apparent. That's manifest as... Do you know where the second... What's the status of the second circuit case? That was just recently argued. It was recently argued. I listened to the argument. Of course, they don't... Lesnick is merely persuasive authority in that case. And I don't want to... How closely... I mean, is it the exact same issue in the second circuit case as in Lesnick? I believe it's very similar to the issue that Lesnick faced. Right. So I would say that it is very similar to the issue that Lesnick faced. It's New York, I think, is the forum. I don't know how long it'll take for a ruling to come out. There was... I don't know what more to say about that. Otherwise, I'd just be making predictions based on the questions the judges asked. But you can tell us they haven't issued their decision yet. As of last night, they have not issued their decision. Yeah, I think. I mean, maybe as of yesterday. I think it was just two weeks ago, so they would definitely be moving forward. Yeah, no. I mean, I looked recently, but I can't say. In the last 48 hours, I've checked it. So, you know, the central idea here from Plaintiff Appellee's point of view is that we don't reinvent the wheel. It's rare that you have a case so on point, so recent, so dispositive, and that case is Lesnick. And a lot of the things that I would be saying if I was in New York, I shouldn't have to say, because Lesnick said them. So Lesnick said that the legislative history of Dodd-Frank is that it didn't like preemption. It wanted to rein in preemption. It thought preemption was a problem. That's a policy choice that Congress is entitled to make, and it made it, and it made it in 12 U.S.C. 25B, which is, like I said, I'm calling it an anti-preemption statute. I'm not trying to be dramatic, but that's what it is. It's definitely intended to rein in the OCC and intended to rein in NBA preemption, and there's a lot of facets to it. We could talk about them. And then the other piece of that is 15 U.S.C. 1639D, where, at the same time, in Dodd-Frank, it mandates escrow accounts and mandates that interest on escrow is paid on them in accordance with state laws. So that's a pretty strong manifestation of congressional intent to rein in preemption, including any preemption of interest on escrow, and that's what Lesnick says. That's what Lesnick goes through and explains, and why I shouldn't have to explain it now too much, because I can cite Lesnick. This case adds another layer, because it involves a Federal Savings Association, and we know that it's not controverted in this case. The complaints that the Congress had about preemption with the OCC and NBA, it had many more complaints about the OTS and HOLA. It abolished the OTS. It abolished HOLA field preemption. HOLA, at least as far as preemption is concerned, ceases to exist as a category as of the effective date, July 21, 2010. Everything shifted over to that NBA preemption, new NBA preemption regime, 12 U.S.C. 25B. Can I ask you, so McShannock does have this analysis of the downstream effects. In your opinion, should that be limited to kind of determining an incidental effect, or could you presumably look at more broadly the downstream effects for purposes of determining a significant effect under the NBA? I don't think there's any evidence of downstream effects in this record. The evidence is that business lending continues. People are buying servicing rights. People are buying loans. People are selling subservicing rights. Nothing has changed. They have all this data available. They could have tried to put it out there. That is the current situation. I think the only — the downstream effects are, as Your Honor stated, it's exactly quote-unquote, you know, it's not — we use the number 9 million, which is the amount of judgment, let's say it was 1 million a year, 2 million a year. It's that much less profitable, and that does get disseminated through the system, through the secondary markets. There is a downstream effect, but it's just that profitability, and it's very diffuse. We don't know exactly where these little tiny bits of profitability are getting lost, but they are. There's every year in these billions and billions of dollars in loans, and billions and billions, and I don't know, hundreds of billions of trillions in dollars in interest that are at issue, there's maybe $2 million, at least in this case, per year, $1 million per year, that is of lost profits that is getting disseminated through the secondary markets in some manner, and we don't really know how it's being allocated. There's nothing in the record to tell us about that. So I don't think the downstream effects are that extreme in this case, but they're not irrelevant. They're just not — they don't significantly interfere with banking. Banking goes on. Thank you, Your Honor. Thank you, counsel. We'll give you two minutes for rebuttal. Thank you very much, Your Honor. Three quick points. One, if indeed this panel understands Loznak to mean that the preemption or not of Section 2954.8 is just completely immune to evidentiary inquiry at this point, then as we did in the briefs, we would reserve our right to seek appropriate further review of that. But I want to take one more run at suggesting that that's not what Loznak actually did. And I think Your Honor raised a good question, which is where is the discussion in Loznak of why the 2% rate in particular is not preempted? Where is the discussion of why that's not punitively high? Where's the discussion of why California's 2% rate in particular does not create significant interference? I don't see that discussion anywhere in the opinion. And I read that — Aren't we back to overruling Loznak? I mean, Loznak said it's not preempted, 2% is fine, and put in footnote 7 that said maybe a higher interest rate wouldn't be fine. But how can we go in and say, oh, Loznak didn't have enough analysis, and now that we do more analysis, Loznak was wrong? Right, Your Honor. What I'm suggesting is that the holding of Loznak, what this panel should construe as the holding of Loznak, is what Loznak itself says three times on page 1194, where it restricts the holding or restricts the operative question to what Bank of America has done. But the ordinary way to determine a holding is to determine what the basis for the decision was. And my suggestion is that if there's no explanation for why 2% isn't preempted, then the more likely explanation is that Loznak didn't actually make that holding in a way that would bind future courts. The last point is that Loznak himself understood the case more narrowly. In his brief opposition to cert, he said that there's still factual questions that aren't answered by the factual record regarding the real-world impact of the state law in question and the ability of the bank to exercise its powers while abiding by the law. So for those reasons, we ask your court to reverse. Counsel, I do have a follow-up question. So do you have any remedy, let's say, with the comptroller of the currency? Do you have any ability to go to the comptroller of the currency and get the comptroller of the currency to say, well, whatever the rule may have been with respect to Bank of America, that same rule wouldn't necessarily apply to Flagstar? I believe we could, Your Honor. Loznak certainly said that what the OCC had done pre-Dodd-Frank was not cutting it. But I believe that option would be open to us to request that relief. And has the OCC issued any guidance or any opinion on Loznak or any of these related cases? Did he participate, for example, in the Second Circuit case? Well, I will say that the OCC has been very active as an amicus in and following Loznak, but I'm not aware of other guys. On whose side? On the side of preemption. Okay. All right. Thank you. Thank you, Your Honor. Thank you, Counsel. Thank you both for your good arguments in this case. The case is now submitted.
judges: BYBEE, NELSON, Bolton